**(90 South. 640)**

**No. 23723.**

**PRUDHOMME et al. v. SAVANT.**

(May 2, 1921. On Rehearing, Jan. 2, 1922.)

*(Syllabus by Editorial Staff.)*

On Rehearing.

1. Wills �köö148—Nuncupative will held not invalid because notary wrote it upon a typewriter; "written."

Inasmuch as the Code does not require that a nuncupative will by public act shall be written in the handwriting of the notary, the court cannot require it, and, the requirement being merely that it be "written by the notary as it is dictated" by the testator, it is not invalid because the notary wrote it on a typewriter.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Write—Writing.]

Monroe, C. J., and Dawkins and Overton, JJ., dissenting.

*(Syllabus by the Dissenting Justices.)*

2. Nuncupative will by public act must be written by the hand of the notary, and not with a typewriter.

It was and is the intention of article 1578 of the Civil Code not only that the nuncupative

will by public act should and shall be written by the notary himself, but that it should and shall be so written in the sense in which that word was generally understood when the law was enacted and re-enacted prior to the invention of the typewriter; that is, by the hand of the notary, and not through the instrumentality of any machine the finished product of which may upon its face be insusceptible of identification as the handwriting of the notary. (Per Monroe, C. J., and Dawkins and Overton, JJ., dissenting.)

**3. "Typewriter" is a printing, and not a "writing," machine.**

The "typewriter," so called, is essentially a printing, and not a writing, machine, and the name as so applied seems to involve an unwarranted use of the word "writer," since the difference between letters and words drawn with a pen and those stamped with a type or other molded form is the same as that between any other hand drawing and an impression made by a stamp or die or taken from engraved steel or stone. (Per Monroe, C. J., and Dawkins and Overton, JJ., dissenting.)

Appeal from Sixteenth Judicial District Court, Parish of Evangeline; B. H. Pavy, Judge.

Suit by Mrs. Marie Alma Prudhomme and others against Mrs. Emily Savant to have declared null and void an instrument purporting to be a nuncupative will. Judgment for plaintiffs and the defendant appeals. Judgment annulled and plaintiffs' demands rejected and suit dismissed, on rehearing.

J. Hugo Dore, of Ville Platte (John W. Lewis, of Opelousas, of counsel), for appellant.

E. B. Dubuisson, of Opelousas, for appellees.

MONROE, C. J. Plaintiffs sue to have declared null and void an instrument purporting to be the nuncupative will, by public act, of Angelas O. Prudhomme (of whom they are the legal heirs), upon the ground that, save the signatures, the instrument is "typewritten," instead of being in the hand-

150 LA.—9

writing of the notary by whom it was executed; it being admitted that the typewriting machine was operated by the notary. The question to be decided is concisely stated by defendant's counsel as follows:

"Under the article in question [article 1578 of the Civil Code] we readily concede that no one else but the notary himself could receive and write down the testament, but we earnestly maintain that, so long as the notary receives it, either in handwriting or on the typewriter, the requirements of the law are fully met."

The articles of the Civil Code which seem relevant to the question are as follows:

"Art. 1575. * * * Testaments, whether nuncupative or mystic, must be drawn up in writing, either by the testator himself, or by some other person under his dictation. * * *

"Art. 1577. * * * Nuncupative testaments may be made by public act, or by act under private signature.

"Art. 1578. * * * The nuncupative testaments by public act must be received by a notary public, in presence of three witnesses residing in the place where the will is executed, or of five witnesses not residing in the place. This testament must be dictated by the testator, and written by the notary as it is dictated. It must then be read by the testator in presence of the witnesses. Express mention is made of the whole, observing that all these formalities must be fulfilled at one time without interruption, and without turning aside to other acts.

"Art. 1579. * * * This testament must be signed by the testator; if he declares that he knows not how, or is not able to sign, express mention of his declaration, as also the cause that hinders him from signing, must be made in the act.

"Art. 1580. * * * This testament must be signed by the witnesses, or at least by one of them for all, if the others cannot write.

"Art. 1588. * * * The olographic testament is that which is written by the testator himself. In order to be valid, it must be entirely written, dated and signed by the hand of the testator. It is subject to no other form, and may be made anywhere, even out of the state. * * *

"Art. 1595. * * * The formalities to which testaments are subject by the provision

of the present section must be observed; otherwise the testaments are null and void. * * *

"Art. 1647. * * * Nuncupative testaments received by public acts do not require to be proved, that their execution may be ordered; they are full proof of themselves, unless they are alleged to be forged."

Article 930 of the Code of Practice reads:

"If the will be made by a public act, it shall be sufficient for the petitioner [praying that it be ordered executed] to annex a copy of it in due form to his petition, and to pray for the execution and recording of it."

"Art. 14 [Civil Code]. * * * The words of a law are generally to be understood in their most usual signification, without attending so much to the niceties of grammar rules as to the general and popular use of the words.

"Art. 15. * * * Terms of art or technical terms and phrases, are to be interpreted according to their received meaning and acceptation with the learned in the art, trade or profession to which they refer. * * *

"Art. 19. * * * When, to prevent fraud, or from any other motives of public good, the law declares certain acts void, its provisions are not to be dispensed with on the ground that the particular act in question has been proved not to be fraudulent, or not to be contrary to the public good."

As far back as 1813 the validity of an instrument purporting to be a nuncupative will by public act was attacked upon the ground (among others) that it had not been written by the notary, but by his clerk, and, the law upon that subject being the same then as now (Code of 1808, art. 108), this court said:

"The law which makes it the duty of the notary to write the will, is not only clear in its expressions—it is also clear in its object. The Legislature has been unwilling to trust any body else but the notary with the sacred function of writing a will—a function which, in unfaithful or negligent hands, may be liable to abuse of the most serious and most dangerous nature. But, be that as it may, the law is such, and must be obeyed. * * * The other objections raised against this will, though not without some weight, are not deemed of sufficient importance to be adverted to. But

we are of opinion that a nuncupative will, by public act, must be in the handwriting of the notary himself, and that it must be dictated by the notary to the testator, in the presence of the witnesses. Consequently, although there appears nothing in this case but what is perfectly fair, the court is bound to say that his will is not valid in law." Knight v. Smith, 3 Mart. (O. S.) 165 et seq.

Counsel for defendant concede that the doctrine that the writing of a nuncupative will by public act must be done by the notary himself remains unquestioned and is unquestionable, and they concede that the olographic will must be written, dated, and signed by the testator, and that that requirement excludes the use of a "typewriter"; but they argue with regard to the nuncupative will by public act that the execution (printing we should call it) of such an instrument by means of a "typewriter" is the "writing" of it as required by the statute. That view of the matter, as we think, not only ignores the rule of interpretation that "the words of a law are generally to be understood in their most usual signification," but it attributes to the language of the law here in question a meaning which its makers could not, by any possibility, have intended, since the "typewriter" of to-day had not then been invented, was not brought into use until after a lapse of more than 60 years (its earliest appearance having been, probably, in 1873) and was and is a printing, rather than a writing machine. In the meanwhile the law which was applied in the case above cited had been incorporated in the Code of 1825, amended and re-enacted in 1870, and during that entire period there had been but two commonly known and commonly used methods whereby the thoughts and wishes of men were expressed and perpetuated in a form intelligible through the sense of sight—the one by writing; the other by printing.

Those words, respectively, are defined as follows:

"Writing. * * * 1. Specifically, as distinguished from printing, stamping, incision, etc., the act or art of tracing graphic signs, by hand, on paper, parchment or any other material with a pen and ink, style, pencil, or any other instrument; also the written character or words."

"Printing. * * * 2. The art or process of producing printed matter for reading (including illustrations, etc.) by composition and imposition of types, and their subjection, when inked to pressure upon paper in a printing press; the typographic art, typography in the fullest sense. * * * Printing comprises two distinct trades—composition, or the art of arranging types, and press work, or the art of getting impressions from composed types."

Cent. Dic. and Cyc. Verb. "Writing," "Printing."

So far as we are advised, printing presses were operated by hand exclusively in this country prior to the adoption of the Code of 1808, and probably until a much later period; and there are, no doubt, many hand presses in operation at this time, but whether there are any notaries who are capable of setting the type required for particular work and operating the presses in the printing of such work is another matter. This court is called upon at times to examine candidates for notarial commissions as to their qualifications, but, knowing of no law which requires those officers to qualify as printers, and not ourselves being so qualified, we have not extended our examinations in that direction. Upon the whole, we are satisfied that our lawmakers did not intend that the duty imposed upon notaries of writing nuncupative wills as dictated by testators without interruption and without turning aside to other acts should be discharged by the operation of printing presses, and, we hasten to add, the learned counsel for defendants do not so contend.

The question which remains is: If the lawmakers did not intend that nuncupative wills by public acts should be "written" by hand printing machines, then in common use, is it reasonable to suppose that they intended that the requirement that they should be written by the notaries might be complied with by the use of machines not then invented, not to be invented for more than half a century, and the operation and product of which differs almost as widely from the operation and product of writing by hand as do the operation and product of hand printing machines? Our answer to that question is "No;" our conclusion being that it was and is the intention of the law, not only that the will in question should and shall be written by the notary, himself, but that it should, and shall, be "written" in the sense in which that word was generally understood when the law was enacted and reenacted prior to the invention of the typewriter; that is, by the hand of the notary, and not through the instrumentality of any machine the finished work of which may upon its face be insusceptible of identification as that of the notary. The "typewriter" (so called) is essentially a machine of that character, a printing, and not a writing, machine, in which the metal type constituting each letter is attached to or molded upon one end of an arm or lever, the other end of which is a key (such as a piano key) forming one of a keyboard, so that, upon the striking of the key by the operator, the type, with the mechanical interposition of a carbon-blacked ribbon, stamps upon the paper (mechanically brought into position to receive it) the figure of the letter which the type represents; the product being, not "script," readily susceptible of identification as the work of the supposed writer, but printed matter indistinguishable from that which might be produced by any other person on any other machine from the same factory. The term "typewriter," as applied to the machine in question involves as it appears to us an unwarranted use of the word "writer," since the difference between letters and words drawn with a pen and those

stamped with a type or molded form is the same as that between any other hand drawing and an impression made by a stamp or die or taken from an engraving on steel or stone. The definition of the term "typewriter" as we find it in the work already cited seems inaccurate in describing it as a "machine for mechanical writing," since the operation of the machine more nearly resembles printing, thus:

"Typewrite. * * * To print or reproduce by means of a typewriter. * * *

"Typewriter. * * * A machine for mechanical writing, operated by hand, and printing one letter, or combination of letters, at a time, by the impress of the type adapted to that purpose. 2. An operator on a typewriting machine; one who prints characters on paper by means of a typewriter. * * *

"Typewriting. * * * The process of printing, letter by letter, by the use of a typewriter; also work done by this process."

Cent. Dic. and Cyc.

Defendant's learned counsel say in their brief:

"Of course, no one would contend that such an instrument (referring to the nuncupative will by public act considered in Knight v. Smith, supra) would be valid, under article 1578, because that article specifically provides that the will must be written by the notary. But that decision accentuates the ground upon which the will under discussion was set aside. It declares: 'The Legislature has been unwilling to trust anybody else but the notary with the sacred function of writing a will—a function which, in unfaithful or negligent hands, may be liable to abuse of the most serious and most dangerous character.'

"And in Succession of Robertson, 49 La. Ann. 868, 21 South. 586, 62 Am. St. Rep. 672, the court had to deal with an olographic will which was partly printed. Of course, that case bears no analogy to the instant case, except that the court did intimate that, unless it was expressly forbidden by a prohibitory law, printed or typewritten words could serve as in the place of handwriting, thus: 'The writing essential to a deed may include printed words without violating a prohibitory law. But in the matter of an olographic testament it must be written; otherwise the pain of nullity must be inevitable.' "

The identical requirement which obliges the notary himself to receive the will, as dictated by the testator, also requires that it shall be "written" by him as thus received, and it is no more specific in the one respect than the other; nor does it appear to us that the reason for the requirement is any the less obvious and imperative in the one case than the other; the purpose throughout being to place and fix the grave responsibility of carrying into effect the intention of the testator upon a responsible official whose work should thereafter be susceptible of easy identification. Moreover, the language of the court in the cited case reads:

"But we are of opinion that a nuncupative will by public act must be in the handwriting of the notary himself."

And it was because the will there in question was not written by the notary, and hence was not in his handwriting, that it was declared invalid. It is also said that the requirement as to the olographic will that "it must be entirely written, dated, and signed by the hand of the testator" and, as to the nuncupative testament by public act that it is "merely," that it "must be written by the notary," indicates that the lawmakers intended to make a distinction with respect to the manner in which the respective wills should be executed.

It is obvious that it was the intention to make a wide distinction between the manner of making the wills, since the one is required to be written by the testator and the other by the notary, at the dictation of the testator, but we find no more reason for assuming that the notary could legally make use of a hand printing press or machine in preparing the will required to be written by him than in so assuming with regard to the will which the testator is required to write with his own hand. How else could either will be written save by the hand of the person authorized to write it; and why, in ei-

ther case, should the lawmaker have required the will to be written and have declared that the formalities to which they were thus made subject "must be observed; otherwise the testaments are null and void," if they intended that those formalities need not be observed

The learned counsel cites the Supreme Court of the United States Benson v. McMahon, 127 J. S. 457, 8 Sup. Ct. 1240, 32 L. Ed. 234 to the effect that, "where * * * such instruments are required to be in writing, the term 'writing' includes printing as well as script"; but it is hardly necessary to say that, in using that language, the court was not interpreting or applying the provisions of our Civil Code regulating the manner of making wills in this state; the facts in that connection being that it was considering an application for habeas corpus by a person who was sought to be extradited by the Mexican authorities upon a charge of having perpetrated a swindle in the city of Mexico by issuing and selling in advance and without authority a large number of tickets to a concert to be given in that city by Adelina Patti under the management of Henry Abbey, the particular charge against the applicant being that the tickets, which bore the names of Abbey and were printed, had been forged, and his contention being that, as they were not written, they were not susceptible of being forged. The immediate question before the court was whether the offense with which the applicant was charged was extraditable under the then existing treaty between the two governments, and the court found that "there are no common-law crimes of the United States"; that "almost every state in the Union has recast her criminal law by the enactment of statutes in such a mode that the common law is now only appealed to as an aid in the definition of crimes"; that it was not called on to examine critically whether the offense charged was technically forgery at common law; after which, however, followed the statement:

"But we are not satisfied that the crime of forgery, even at common law, is limited to the production by means of a pen of the resemblance of some man's genuine signature which was produced with a pen. This view of the subject would exclude from the definition of this crime all such instruments as government bonds, bank notes and other obligations of great value, as well as railroad tickets, where the signature of the officer which makes them binding and effectual is impressed upon them by means of a plate or other device representing his genuine signature."

And in support of the view thus expressed the court cites various authorities, the bearing of which, and of the main case, upon the question here presented, is indirect, not to say inappreciable. Among other cases cited was Henshaw v. Foster, 9 Pick. (Mass.) 312, in which it appeared that a provision of the Constitution of Massachusetts declared that "every member of the House of Representatives shall be chosen by written votes"; that a printed ballot was offered, and rejected; and that the matter was taken to the Supreme Court, by which it was decided that the printed vote came within the meaning of the law requiring votes to be in writing.

9 Pick. is not at hand, but the statement by the Supreme Court of the United States that the opinion thus referred to was "very well considered" requires no verification, and we entertain no doubt that the circumstances upon which the opinion was based were such as to authorize the conclusion reached. On the other hand, in State ex rel. Mize v. McElroy, 44 La. Ann. 796, 11 South. 133, 16 L. R. A. 278, 32 Am. St. Rep. 355, it appeared that the law required the names of candidates for certain offices to be printed on the ballots, and that relators' name, having been so printed, was erased from a number of the ballots, and the name of his opponent substituted in writing; and it was

held by this court that the erasure and substitution were illegal.

The question in both cases was: What was the intention of the law makers, the purpose to be accomplished, and the methods to be adopted for its accomplishment? Counsel for defendant cites also Hunt v. Dexter Sulphite Pulp & Paper Co., 183 N. Y. 544, 76 N. E. 1097, to the effect that a typewritten notice answers the requirement of a written notice as contained in an Employers' Liability Act; Cummings v. Wallower, 47 Okl. 627, 149 Pac. 864, L. R. A. 1915E, 774, to the effect that by-laws required to be "copied in a legible hand" may be copied upon a typewriter; Deep River Nat. Bank's Appeal, 73 Conn. 341, 47 Atl. 675, to the effect that, under a statute providing that no acknowledgment or promise by a person deceased shall take a claim out of the statute of limitations," unless the same be contained in some writing made or signed by the party charged, a typewritten acknowledgment shown to have been dictated by such party, and to which his name was affixed, with his authority, by means of a rubber stamp, was admissible.

The only case involving a will to which we are referred is that of Sears v. Sears, (mentioned by counsel as "another leading case on the subject" of the sufficiency of the product of the typewriter where writing is required), reported in 77 Ohio St. 104, 82 N. E. 1067, 17 L. R. A. (N. S.) 353, 11 Ann. Cas. 1008. The position of the learned counsel, however, finds no support in that case wherein it appears that section 4947 in part 3 of the Revised Statutes of Ohio (being that part, as we infer, which regulates the making of wills), declares that "unless the context shows that another sense was intended, the word "writing" includes printing"; that in 1895 section 5916 of that part was amended so as to read:

"Every last will and testament (except nuncupative wills hereinafter provided for) shall be in writing and may be handwritten or typewritten. * * *"

And it was contended that the effect of the amendment was not merely to authorize a typewritten will, but also to exclude a printed will, which contention the court disposed of as follows, to wit:

"Typewriting has come into general use since the revision of the statutes in 1880, and the manifest intention of the Legislature was to authorize its use in addition to handwriting and printing in the making of wills, and not to substitute typewriting for printing; so that a will is not invalid because it is partly in print."

It will be observed, therefore, that writing was not held to include either typewriting or printing, but that special legislation was thought to be required to authorize any will to be made in either of those forms, and that nuncupative wills were expressly excepted from the operation of that legislation.

Judgment affirmed.

O'NIELL, J. (dissenting). The provisions of the Civil Code do not require—and there is no reason why they should require—that a notary public who takes down the dictation of a nuncupative testament must write the will with a pen or pencil or in his own handwriting. The requirement, in that respect is merely that the testament shall be "written by the notary as it is dictated" by the testator.

With regard to the olographic testament the Code requires:

"In order to be valid it must be entirely written, dated and signed by the hand of the testator himself"—de la main du testateur lui-même. R. C. C. 1581.

That means, of course, in the handwriting of the testator. It is so explained in article 1648, prescribing the method of proving olographic testaments, viz:

"The olographic testament * * * must be acknowledged and proved by the declaration of two credible persons, who must attest that they

recognize the testament as being entirely written. dated, and signed in the testator's handwriting."

Originally, and until it was amended by Act 119 of 1896, p. 168, article 1648 of the Code required that the witnesses, to prove an olographic testament, should give the reason for knowing the testator's handwriting "as having often seen him write and sign during his lifetime." That requirement was stricken out by the amending statute, and, in lieu thereof, the amended article requires:

"The judge shall interrogate the witnesses under oath touching their knowledge of the testator's handwriting and signature and shall satisfy himself that they are familiar therewith, making mention of the whole in his procés verbal thereof."

Hence it is now and always has been the law of this state that an instrument purporting to be an olographic testament cannot be admitted to probate or ordered executed unless two credible persons, familiar with the testator's handwriting, prove the genuineness of the will' by attesting "that they recognize the testament as being entirely written, dated, and signed in the testator's handwriting." For that reason an instrument purporting to be an olographic will cannot be given effect if written with a typewriter or with any other instrument that does not show the writer's characteristic handwriting.

The purpose of requiring that an olographic testament shall be entirely in the handwriting of the testator is to prevent forgery of such testaments, because, as the last paragraph of article 1581 says:

"It is subject to no other form, and may be made anywhere, even out of the state."

But the law does not require that a nuncupative testament shall be written in the handwriting of the notary public who receives and records the dictation. The reason is that a nuncupative testament by public act cannot be forged, except by a conspiracy on the part of a notary public and three or more witnesses. Any other forger would have to imitate the signature of a notary public and of three or more witnesses, as well as the signature of the testator, and would then have to trust that the notary public and the witnesses would all be dead when the testator would die. Therefore to require the notary to write the testament in his own handwriting would not interfere with his forging such a testament.

The writers of the Code made all the provisions that were deemed necessary to prevent fraud or error in the making of nuncupative testaments by public act; and the court has no authority to add other requirements or prescribe additional safeguards. The dictation by the testator, the writing of the testament by the notary as it is dictated, the reading of the will by the notary to the testator, and the signing of it, must all be done in the presence of three resident witnesses or of five witnesses if they reside elsewhere, all of which formalities must be performed at one time and without interruption or turning aside to any other act; and the observance of all of the formalities must be recorded in the instrument. When all of that has been done, the will proves itself. Article 1647 declares:

"Nuncupative testaments received by public acts do not require to be proved, that their execution may be ordered; they are full proof of themselves, unless they are alleged to be forged."

I have explained that such a testament could be forged only by a notary public or with his connivance. Article 930 of the Code of Practice, prescribing the method of opening and proving wills, declares:

"If the will be made by a public act, it shall be sufficient for the petitioner to annex a copy of it in due form to his petition, and to pray for the execution and recording of it."

The certified copy, "in due form," whether written with a typewriter or in the handwriting of the notary, would not show whether the original was written in the handwriting of the notary, or what kind of writing instrument was used.

Of course, the compilers of the Code Napoléon and the redactors of the Louisiana Code in all probability did not contemplate that notaries public would ever use such a writing instrument as one of our modern typewriters. Their idea was that the work would be done with a stylus or quill. But that is no reason for saying now that writing with a typewriter is not writing, within the meaning of the law that requires certain transactions to be made in writing. So long as the law does not require that a nuncupative testament shall be made in the characteristic handwriting of the notary public, there is no more reason for saying that it shall not be written with a typewriter than there would be for saying that typewritten evidence of title to real estate is not in writing.

The question before us is not whether the writers of the Code intended to allow notaries public to use typewriters, in taking down the dictation of nuncupative testaments. The question is whether the writers of the Code intended to forbid the use of typewriters for that purpose. If the writers of the Code did not anticipate or contemplate the invention of typewriters, it is certain that they did not intend to forbid the use of such machines in the writing of instruments that were not required to be in any individual or characteristic handwriting.

The question presented in this case was not an issue in the case of Knight v. Smith, 3 Mart. (O. S.) 156, decided 108 years ago. The complaint in that case was that the notary's clerk had written the will. The court merely applied the strict letter of the law that required the notary himself to write the will, saying:

"The law which makes it the duty of the notary to write the will is not only clear in its expressions—it is also clear in its object. The Legislature has been unwilling to trust anybody else but the notary with the sacred function of writing a will—a function which, in unfaithful or negligent hands, may be liable to abuse of the most serious and most dangerous nature. But, be that as it may, the law is such, and must be obeyed."

The court then quoted and applied the rule established in article 13 of the Code that—

"When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit."

It is to be noted, too, that the court's statement of the reason for the requirement of the law had nothing to do with the characteristic handwriting of the notary public. Therefore, when the court said, at the conclusion of its opinion, that the testament should have been written "in the handwriting of the notary himself," it meant merely that it should have been written by the notary himself. It is as certain that the court did not then intend to forbid the use of a typewriter or prescribe the kind of writing instrument to be used, as it is certain that the court did not intend to say that the notary should write only with his hand, and not attempt to use his foot or other part of his anatomy.

I respectfully submit that the majority opinion in this case is not in accord with the rule of strict construction of the requirements of the law for the making of wills. We have no more authority for adding anything to the requirements of the law in that respect than we have for abolishing any one of them.

The consequence of the majority opinion and decree rendered in this case will be the annulment of every nuncupative testament

written by a notary public by means of a typewriter, or not in his characteristic handwriting. The ruling, I respectfully repeat, is not warranted by either the letter or the spirit of the law.

For these reasons, I respectfully dissent.

## On Rehearing.

BAKER, J. On the original hearing of this case it was held that a nuncupative testament by public act was invalid because, although it was entirely written by the notary public as dictated by the testator, and was clothed with all the forms prescribed in the Civil Code, it was written with a typewriter. The ruling, in effect, was that the instrument should have been written in the handwriting of the notary.

[1] After a more thorough study and consideration of the subject we have concluded that, inasmuch as the Code does not require that a nuncupative will by a public act shall be written in the handwriting of the notary, the court has no authority to require it. The Code does require that an olographic will shall be entirely written, dated, and signed in the handwriting of the testator. But, with regard to the nuncupative will by public act, the requirement in that respect is merely that it shall be "written by the notary as it is dictated" by the testator. The Code also provides all other safeguards that were deemed necessary to prevent fraud or error in the making of nuncupative testaments by public act. The dictation and writing of the testament, the reading of it by the notary to the testator, and the signing of it, must all be done in the presence of three witnesses residing in the place where the will is made, or in the presence of five witnesses if they reside elsewhere, all of which must be done at one time and without interruption or turning aside to any other act; and the observance of the formalities must be noted in the instrument. We have no more authority for adding to these sacramental requirements than we would have for dispensing with any of them.

Notwithstanding the framers of the Code required that olographic wills should be written in the handwriting of the testator, it is very likely they did not contemplate the invention of a writing machine that would not show the characteristic handwriting of the writer. But that is the strongest reason that can be given for saying that the framers of the Code did not intend to forbid the use of such an instrument in the writing of wills that were not required to be written in any particular or characteristic handwriting. To hold that the writers of the Code intended to forbid the use of such an instrument in the writing of nuncupative wills by public act would be the same as to say that such testaments must be so written as to be identified by the handwriting of the notary public, just as an olographic will is invalid unless it be identified by the handwriting of the testator. The law does not read that way, and we cannot so write it without usurping the province of the Legislature.

The judgment appealed from is annulled, and plaintiffs' demands are rejected, and their suit is dismissed at their cost.

MONROE, C. J., dissents and adheres to view expressed in original opinion handed down.

DAWKINS and OVERTON, JJ. dissent.