BARHAM, Justice
(dissenting).
I must dissent from the majority opinion 'in this case since I cannot agree with the result or with the historical interpretation ;given to Article 185 of the Civil Code. That article reads in pertinent part: “The husband can not by alleging his natural impotence, disown the child * *
I do agree with the majority that sterility was very probably understood by the French in the Nineteenth Century and the redactors of our Civil Codes to be included within the term “impotence” or “l’impuiss.ance”. A distinction is drawn between the two in Bouvier’s Law Dictionary (Rawle ■ed. 1897) in defining “impotence”, but in ■defining “sterility” the terms are analogized: “Barrenness; incapacity to produce .a child. It is curable and incurable; when ■of the latter kind at the time of the marriage, and arising from impotency, it is a good cause for dissolving a marriage. 1 Foderé, Méd.Lég. § 254. See IMPOTENCY.” Even the latest edition of Black’s Law Dictionary (3rd ed. 1944) recognized that the two terms are interrelated in stating that impotency “has also been used synonymously with ‘sterility’ ”.
More important than an attempt to find a current dictionary definition of “impotence” would be a review of the French law for a definition of the term. The French jurisprudence in defining the term “l’impuissance” has in an ever-increasing majority resolved that impotence does indeed encompass sterility and all forms of sexual disabilities which prevent procreation. Gebler, Le Droit Frangais de la Filiation et la Vérité (Paris 1970), fn 49, p. 157. Mme Gebler says: Nevertheless the courts have refused to consider only the letter of the text. They gave to article 312 the following meaning: “incapacity to have sexual relations resulting in procreation”. Mayr- and, “La preuve de non-paternité”, in La revue du barreau de la province de Québec, 1965, p. 177(195), says that the jurisprudence of France employs a double tour de force: to similize sterility to impotence and illness to accident. At Fn 65 the following decisions of courts are cited: Lille, November 19, 1946; Bordeaux, February 7, 1951; Marseilles, July 23, 1953; Nancy, February 13, 1957.[1]
*948 Once we accept the conclusion that sterility is included within the term impotence, this case presents an issue which is res nova for this court. The first question to be considered is whether our law recognizes an action en desaveu on the ground of impotency which is not “natural”.
The language variations of Article 185 and its predecessors clearly indicate that under that article’s present construction it was meant to allow the husband to proceed in an action for disavowal based upon impotence, sterility, infertility, or other medical basis which makes procreation impossible for him and which is an unnaturally acquired condition. The Civil Code of 1808 (Art. 7, par. 2) forbade an action en desaveu on the allegation of accidental and natural impotency. This provision was apparently adopted with the idea of following the French in regard to natural impotency but of departing from the French recognition of allowing disavowal when the impotency of the husband was the effect of some accident (C.N. Art. 312). The Civil Code of 1825, however, included an amendment to that article without comment for the change. The prohibition of disavowal actions based upon accidental impotency was deleted (Art. 204). Since the adjective “natural” was retained before the word “impotence” and “accidental” omitted in the 1825 Code and in our present Code of 1870, the obvious intent of this amendment was to exclude the prohibition against disavowal where accidental or unnatural cause produced “impotence.”
Believing that the right exists to bring an action en desaveu based upon sterility as well as inability to perform the sexual act when this inability is not of a natural origin, I find it necessary next to determine what can constitute unnatural impotence. The majority has said that Planiol states that “accidental impotence” was not clearly defined in Article 312 of the French Civil Code. However, Planiol’s discussion bears further consideration. It reads:
“The husband’s impotence is recognized as a ground for disavowal only when it is the effect of some accident (Art. 312). What should be understood by 'accident’ ? Everybody agrees that the word applies to wounds and mutilations due to a fall, a combat, a surgical operation, or to any event of this nature. But should illness that may entail a prolonged prostration or weakness be classed among accidents? The question is an open one. The predominant view is that those who drafted the law had in mind a physical lesion due to an external cause. This excluded illness for its cause is internal. But the words, by the effect of some accident’, have a most vague meaning. And it was formally said by Duveyrier, an orator of the Tribunat, that a serious and prolonged illness could bring about physical impossibility as well as could wounds or mutilations. Locré Legislation civile, Vol. IV, p. 290). *950 Toullier, Proudhon, Demante, Valette and Demolombe declared in that sense.” (Emphasis supplied.) 1 Pt. 1 Planiol, Traité Eléméntaire de Droit Civil (trans. La.St. L.Inst.1959) § 1433.
It appears that Planiol recognized that the majority of the doctrinal writers believed -that illness and disease produce in certain cases impotence “by the effect of some accident”. Baudry--Lacantinerie, who was of the view that the phrase “de quelque accident” did not include impotence resulting from illness or disease, did admit that the majority of the doctrinaires held a belief to the contrary. 4 Baudry-Lacantinerie, Traité de Droit Civil (3 e éd. 1907), § 482, p. 407.[2] See also 5 Locré, Esprit du Code Napoléon pp. 28-36.
The current French jurisprudence and doctrine both support the view that impotence or sterility caused by illness and disease may be grounds for the action en desaveu.[3] Gebler, op. cit. supra, p. 155, fn 38, quotes Merger, “Étude juridique de 1’ insémination artificielle”, Bulletin de la Fédération des sociétés de gynécologie, 1957, p. 319(323), for the proposition: No doubt that the strictness of the Code, prudent and wise in 1804, is unacceptable today; to permit a man to invoke an accident and to refuse him the right to invoke an illness is a piece of nonsense. All the courts, says Mme Gebler, which have passed upon this question have considered that an illness can entail the accidental impotence of Article 312.[4]
Finding ourselves with a question that is res nova in our jurisdiction though there is ample jurisprudence interpreting the source of our paternity law, we should give weighty consideration to that jurisprudence and to the doctrine which has evolved from it.
It is very important to note that our Code’s language in regard to disavowal by reason of impotence is far less restrictive than the French. Cf. “l’impuissance naturelle” in the French version of our Article 185 with “l’impuissance naturelle” of the Code Napoleon Article 313 as modified by the following provision of Article 312: *952 “ * * * il était, * * * par l’effet de quelque accident, dans l’impossibilite physique de cohabiter avec sa femme”.
Since we must only determine what is unnatural impotence as opposed to the possible French requirement of determining what is accidental impotence, we are not required to particularize the condition to fit the definition of "accidental”. I submit that unnatural impotence is that impotence which is readily manifest when it occurs, which can be ascertained because of pathological, biological, or organic changes.[5] It is therefore immaterial whether this change is made by mutilation through accident, by vasectomy through surgery, or by other means through illness or disease. The impotence need only be physically, medically, scientifically discernible with certainty. It is the certainty of the inability to procreate and not the nature of the disability that prevents procreation which our Code intends as a criterion for disavowal for impotence.
Just as the French conclude that accidental impotence should not be limited to only external manifestation, I conclude that neither should impotence produced by illness and disease be denied as a ground because there is no external manifestation. This is not to say that illness and disease cannot manifest impotence externally. However, modern medicine and science may very well determine as readily or more readily in a particular case with the same degree of certainty internal changes-that produce absolute infertility or impotence. Of course impotence as a ground for disavowal must be of a permanent nature during the legal period of conception' and could not be subject to remission. Obviously the weight of the evidence establishing this ground should be equivalent to-the weight of evidence for establishing any ground for disavowal. It should meet the-test of showing that the child cannot be-the child of the husband.
The conditions of the conception, pregnancy, birth, and sexual habits as well as-other circumstances could help determine-the credibility of the scientific opinions of’ sterility. Blood-grouping and other medical and scientific procedures could lend assistance in determining the certainty of.' *954 what physical condition in fact exists.[6] But surely a husband who claims sterility should have the opportunity of attempting to discharge the burden of proof that he is unnaturally impotent and therefore not the father of the child of his wife.
The majority has here expressed great apprehension at the consequences of allowing this husband the opportunity to prove his allegation that he was not the father of the child because he could not procreate. It reasons that to grant such an opportunity is against public policy unless the likelihood of successfully making proof was great and the evidence available to sustain the quality of proof was certain. Cf. Note, 36 Tul.L.Rev. 347. Would any trial judge who has heard proof of adultery in divorce cases declare that the quality of proof usually offered in contradictory terms to prove extra-marital sex acts partakes of certainty?
We need not determine whether scientific information in this area can precisely answer the question of paternity here or determine the absolute sterility of this husband. If there is difficulty in evaluating the scientific information, which ordinarily is considered in light of other circumstances, this is not justification for this court to refuse the husband his day in court to discharge the burden imposed upon him by law when he exercises a remedy which I certainly believe is afforded him by the law. It is an incongruity that the majority recognizes the magnificant strides made in medical science in this area by comparing present achievements with Nineteenth Century knowledge, and yet refuses to allow this man the opportunity to resort to new sources of knowledge.
Not only do I disagree with the result and with the historical interpretation given to Article 18S of our Civil Code, but I strongly take issue with the majority’s method and technique of judicial interpretation. The use of exegetical approach in isolation does not discharge the judicial obligation when our court works to and through the Code. While exegesis is certainly helpful, often very enlightening, it can entomb the court and the law in the darkness of the past. The combination of the exegetical, the empirical, and the functional methods of interpretation is required in order that the law serve the people, that the law be a reflection of the people’s understanding, desires, and needs. Moreover, the more comprehensive approach is required under the mandate of our Code itself:
“Art. 18. The universal and most effectual way of discovering the true meaning *956 of a law, when its expressions are dubious, is by considering the reason and spirit of it, or the cause which induced the Legislature to enact it.”
“Art. 3. Customs result from a long series of actions constantly repeated, which have by such repetition, and by uninterrupted acquiescence, acquired the force of a tacit and common consent.”
“Art. 21. In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages where positive law is silent.” (Emphasis supplied.)
In France it is even more sternly pronounced: “Judges who refuse to give a decision under pretext of silence, obscurity or inadequacy of the legislation, may be proceeded against as guilty of denial of justice.” C.N. Art. 4; see also Locré, supra, p. 204.
In Techniques of Judicial Interpretion in Louisiana, 22 La.L.Rev. 727, Mr. Justice Tate said that where the formal wording itself has not provided a rule of law, the objective and functional methods of interpretation which look to policy considerations and the general purpose of the legislation are most effective. He quotes from Loussouarn of France, who says that the Code Napoleon, which reflected the social and economic life of 1804, may upon occasion make a mockery of justice when applied literally to conditions impossible in the minds of the redactors. Problems non-existant and unforeseeable multiply constantly at an increasing rate, and must be decided by the court as the litigants press for their rights. The exegetical approach “paralyzed the judge” and prevents him from determining the legal rights of man in a world unknown to the lawmakers who framed the Code. Following the lead of Gény, the French judiciary moved to the “free scientific research” approach. Loussouarn, The Relative Importance of Legislation, Custom, Doctrine, and Precedent in French Law, 18 La.L.Rev. 235, 242-43.[7] While we may not in Louisi *958 ana be permitted the free rein Gény calls for, we certainly can use the techniques of Gény and the French jurists to determine our law when it is doubtful in language and dubious in meaning. We are a civilian jurisdiction, and we should as a court follow that tradition.
As I understand the majority opinion here, it cannot decide what the law should be in this case. It merely says: “It may be that disavowal for ‘accidental impotence’ as contrasted to ‘natural impotence’ mentioned in C.C. 185 is not prohibited.” In denying the husband’s right to a hearing on the merits, the majority does so with the statement: “When we weigh the benign policy of the State toward innocent children against the mischief, scandal and difficulty of ascertaining the ultimate determinative facts, we conclude that it would be more appropriately a legislative function to change the policy of the State, if it is to be changed, at this time.”[8]
What change in policy is needed here to reach the result this dissent offers? What has been the policy of the state on disavowal for sterility? The courts have been silent. The Code is silent. A functional approach supports the policy I advocate. Comparative law analysis supports that policy. The issue before us must be decided, and it cannot be deferred to legislative counsel. Basing its determination not to fairly adjudicate the issue before it solely upon an historical excursion into the past, the court has not complied with the spirit of the Code or the letter of the Code in discharging the judicial function.
As our Code says, the most important consideration is to determine the true meaning, reason, and spirit of a law. Surely the vast majority of the people— and this would be reflected in their legislative representatives — would find it almost unfathomable that the law would allow disavowal for impotence but not for sterility. Is this fine distinction valid? Does it serve any purpose? Is it the custom of the people as reflected in their mental processes? Is this distinction the public policy of this state? Does the public believe and understand that one condition justifies bastardy and the other does not ?
The majority recognized that the legal issue between the parties to this litigation was whether this husband should be able to attempt to establish that he was naturally sterile so that he could not have been the *960 father of the child of his wife. The majority makes a legislative policy determination that the “prohibition” against disavowal for “ 'natural impotence’ also prohibits disavowal for sterility due to childhood disease”. That prohibition is not contained in the Code. I believe it to be a holding contrary to the public’s belief and understanding and contrary to public policy as expressed in the Code.
I respectfully dissent.

. Gebler, supra, at fn. 49, p. 157, incorrectly quoted Mayrand for this proposition, using “la maladie a l’impuissance” instead of “la maladie a l’accident”. ’

. In fn 3 lie mentions Toullier, Richefort, Proudhon, Massé et Verge, Demante, Arntz, Vállete, Demolombe, and Héan.

. The civilian approach to disavowal of paternity has taken two directions. The Spanish law and that of nations most influenced by that law have entrenched 'into the original ecclesiastically formed tradition of the Spanish law. See Walton, The Civil Law in Spain and Spanish-America (1900). But the French, the Swiss, the Germans, and the Greeks as well as the people of Quebec have all been more realistic in their approach and have made policy changes as social and scientific development required.

.For this statement Mme Gebler cites (fn 42) decisions of the courts of Montpellier, January 31, 1928; Lille, November 19, 1946 (sterility from radiation by X-ray treatment); Bordeaux, February 7, 1951; Nancy, February 13, 1957; Domfront, January 9, 1955. See also fn 49.

. Since “natural impotence” must be accorded some meaning, I will for the purpose of this dissent determine that it means that state of inability to procreate which exists in man by nature. The only impotence produced by nature common to every man is that natural deterioration of the sexual powers and processes which comes with aging. I will for the purpose of this dissent allocate this meaning to natural impotence, believing that it does not do violence to the Code in the light of present-day knowledge, understanding, and social change. I find it difficult to even say that impotence by reason of defect at birth is natural, for it is the freak of nature rather than the usual. Impotency resulting from the aging process is uncertain, deviating, remissive, relative, and often not subject to any objective proof. It is therefore a rational', distinction in disavowal actions.

. Williams v. Williams, 230 La. 1, 87 So.2d 707 (1956), is authority only for the proposition that blood-grouping tests do not alone provide a ground for disavowal. It is not authority that such tests and other scientific evidence cannot be used as supportive proof of the grounds provided in the Code. See Babineaux v. Pernie-Bailey Drilling Co., 261 La. 1080, 262 So.2d 328.

. For further discussion of the judicial process, see Gény, Methode d’interpretation et sources en droit privé positif, 2nd ed. (transí. La.St.L.Inst.1962), with a critical introduction by Jaro Mayda; von Mehren, The Judicial Process in the United States and in France — a Comparative Study, 22 Rev.Jur. de P.R. 235; Dainow, The Method of Legal Development Through Judicial Interpretation in Louisiana and Puerto Rico, 22 Rev.Jur. de P.R. 108; Dainow, The Civil Law and the Common Law: Some Points of Comparison, 15 Am.Journal of Com.Law 419; Friedmann, A Re-examination of the Relations Between English, American and Continental Jurisprudence, 20 Can.Bar.Rev. 175 ; Mayda, Some Critical Reflections on Contemporary Comparative Law, April 11-12, 1969 [ltd. mimeogr. pub. for Institute of Civil Law Studies seminar and published in French in 21 Revue International de Droit Comparé (1969) ] ; Yiannopoulos, Louisiana Civil Law System (1971), §§ 46, 47; Merryman, The Civil Law Tradition, pp. 20-26, 40-49, 149-159, 163-165 (Stanford Univ. Press 1969).

. See Prudhomme v. Savant, 150 La. 256, 90 So. 640, which disposes of a problem of codal interpretation very similar to the one now before the court but in a very different manner. Considering that the framers of the Code were unlikely to have contemplated the invention of the typewriter, the court believed that to be the strongest reason for saying that “ * * * the framers of the Code did not intend to forbid the use of such an instrument in the writing of wills that were not required to be written in any particular or characteristic handwriting”.